## Weissman v. M. L. Blitzstein & Co.

*Banks and banking — Foreign exchange — Purchasers of foreign money from American bankers—Obligation of forwarder.*

Plaintiff paid defendants $190, and defendants in their receipt therefor undertook to purchase for him 1000 Russian rubles and to forward that sum to his wife at Bogopol, Russia. Defendants purchased the rubles from a responsible New York bank, which, in turn, directed its Petrograd correspondent to pay 1000 rubles to defendant's wife from the funds the New York bank had on deposit in the Petrograd bank. The rubles were never paid her. In an action by the purchaser to recover the deposit: *Held,* that in the absence of a guarantee in the receipt of the delivery of the rubles, or evidence that they had been returned to the New York bank, or that that bank or the defendants had received a credit from the Petrograd bank, defendants had discharged their whole duty to plaintiff when in good faith they had employed a reputable New York bank to forward the money, and there could be no recovery.

Trial by court without jury. Municipal Court, Phila. Co., Oct. T., 1922, No. 1143.

The receipt issued by defendants to plaintiff was as follows:

Established 1889

| Money Orders & Drafts | M. L. Blitzstein & Co. | Cable Address: |
|---|---|---|
| to all parts of the world. | Bankers | Blitzstein Philadelphia |
| | 431 South Fourth Street | |

Money Order and Draft Receipt                                    M. L. Blitzstein & Co.
                                                                                          Phila., Pa.
No. 76748          Philadelphia,                                                Sep
                                                                                            22
              The equivalent of R 1000 is $190 00                    1917
                                                        Banking & Foreign Exchange
                                                            full   JG
Received of Mr Joine Weissman          $ 55 00        9-21-17
                    Balance                       $135 00
for the remittance of R 1000 to be forwarded to Feige Waisman
Bogopol Balta                              Per (Illegible)

If there is a balance stated in this receipt, the buyer is held to pay the same within 8 days, else this order will be stopped by cable at his expense, the amount paid in will be refunded less cabling expense after receiving confirmation from abroad.

*Porter, Foulkrod & McCullagh,* for plaintiff.

*Samuel J. Gottesfeld,* for defendant.

BONNIWELL, J., March 2, 1923.—The plaintiff paid defendants on Sept. 24, 1917, $190, and the defendants, as set forth in a written receipt, undertook to

purchase for him 1000 Russian rubles, and to remit and forward that amount to his wife, Feige Weissman, at Bogopol, Balta, Russia.

It is not contended that she received the rubles. She came to America in April, 1922, and plaintiff then made demand upon the defendants for the sum of $190, with interest thereon from Sept. 24, 1917.

The defendants purchased on Oct. 3, 1917, from the Irving National Bank, New York, 1000 Russian rubles, and the Irving National Bank directed its correspondent, the Russo-Asiatic Bank of Petrograd, to pay 1000 Russian rubles to Feige Weissman from the funds the Irving National Bank had on deposit with the Russo-Asiatic Bank.

It is not disputed that the Irving National Bank has endeavored to ascertain whether the 1000 Russian rubles were actually delivered without avail. There is no evidence whatever that the Irving National Bank has ever received the credit from the Russo-Asiatic Bank of 1000 rubles, or that the defendants have received a credit from the Irving National Bank of the rubles in question.

Under the facts and authorities, it appears to the court that the defendants have performed every obligation which they undertook to carry out. The defendants, under the receipt offered in evidence, could only be, so far as remitting money was concerned, in the position of an agent for the plaintiff. The duty resting upon the agent was to exercise due care in the process of forwarding the rubles. The Irving National Bank of New York is one of the largest and most substantial banks in the United States, and, it is testified, carries on the second largest business of all New York banks in the forwarding of foreign exchange. There is nothing contained in the receipt, upon which the controversy rests, which either guarantees the delivery of the rubles to Mrs. Weissman, or insures their safe conduct.

The world conditions were open and notorious. The plaintiff had as complete a knowledge of the demoralization in Russia at the time when he sought to purchase these rubles as the bankers themselves. He undertook, with a knowledge of those conditions, to forward a sum of money to his wife, then living in Russia, and the defendant agent selected was, in the opinion of the court, the best instrument in the form of the Irving National Bank that could have been chosen for that purpose.

It is not testified, and it is not argued, that the rubles in question have ever been returned to the Irving National Bank, or that that bank or the defendants have ever received a credit from the Russo-Asiatic Bank.

Upon the foregoing statement of facts it has been consistently held in every jurisdiction where the question has arisen that, in law as in fact, defendants have fully performed every obligation which rested upon them, and that plaintiff cannot recover.

In Alemian v. American Express Co., 130 N. E. Repr. 253 (237 Mass. 580), the facts were exactly as in the case at bar. There the statement of claim alleged that defendant was in business of transmitting money, that plaintiff paid defendant $259.17 for commission and costs of transmitting to a certain person 1136 Russian rubles to Erivan, Russia.

Defendant cabled instructions to its correspondent in Petrograd. The latter bank transferred to Odessa the Russian rubles and charged defendant. Defendant received no communication regarding the plaintiff's transfer of the money, never received word from Russia that the Russian rubles were or were not delivered, nor has the amount been returned or credited to it.

Payee testified she never received the money.

3 D. & C.

The court there held: "From the admitted facts, it indisputably appears that the plaintiff knew that the defendant did not undertake itself, through its own agents, to deliver the purchased rubles, but did agree to transfer them through corresponding sub-agents to the payee at the place of destination. There is no evidence or claim that the selected sub-agents in Russia were not in every way suitable persons to receive and transmit the money, and there is evidence that the defendants transferred the money of the plaintiff to the sub-agent in Petrograd, that the agent in turn transferred the money to Odessa, and that the money has not been returned as undelivered to the plaintiff."

It was there held that plaintiff could not recover.

In Katcher v. American Express Co., 109 Atl. Repr. 741 (94 N. J. L. 165), the facts were also as in the case at bar. There defendant, for $194.50, agreed to cable a credit of 1000 Russian rubles, and remit or forward same to a designated person. The receipt there given by the defendant was as follows:

"Receipt for Foreign Money Order.

"Cabel.  No. 626442.
"State of  . Sept. 8, 1917.

"Received from Mr. Jack Katshur, Address 172 Prince St., one hundred ninety-four dollars—not exceeding fifty dollars—equivalent of one thousand 1000 Rubel—not exceeding 250 kronen, 250 lire finmarks, 240 marks, 185 kronen, or 100 roubles.

"For remittance to Tese Kacjur.

"At Bereznier, Luckiy, Wolynck.

"AMERICAN EXPRESS COMPANY,
"$194.50.  Emil Germanus,
" (5264.  Aug. 1915)  Branch Agent.

"This receipt is issued subject to the following express conditions:

"It is understood and agreed by and between the person who accepts this receipt and the American Express Company that the acceptance of this receipt by such person shall bind him to the following provisions: 1. This receipt is not negotiable. 2. This receipt must not be issued or accepted for more than the sum of $50, or its equivalent, and is not valid for more than said sum or its equivalent. 3. The sum of money, if covered by this receipt, if duly issued as aforesaid, will be forwarded to the payee named herein, subject to the rules and regulations of the various post-offices used in making this remittance. 4. Any alteration or mutilation of this receipt, or any attempt to alter or amend the printed provisions of this receipt renders it void."

The court there held:

"The first conclusion we reach is that plaintiff misconceived his rights in claiming that the company agreed to deliver or send the sum of $194.50. What it agreed was to remit or forward, not American, but Russian money, and this accords not only with all the reason of the case, but with the testimony of defendant's agent, called by plaintiff's counsel as a witness, that plaintiff said he wanted to send 1000 rubles to Russia. . . .

"But, in view of the importance of the case as typical of a great number of similar transactions, we are not disposed to rest our decision on a mere question of pleading. The fundamental issue is as to the duty of the defendant under its contract. Plaintiff claims that defendant agreed to deliver the money, dollars or rubles, to Tese Kaczier at the place named. We are unable to read any such agreement from the written contract, even as supplemented by parol evidence. It used the word 'remittance' twice, and the word 'for-

ward' (as a verb) once. Without doubt, the two words are used synonymously. As we have said, the word 'deliver' is not used at all. The definitions of the word 'remit' in standard authorities do not involve the idea of delivery. . . .

"(1) The proper interpretation of the contract before us is this: That the express company was to convert the plaintiff's money, after deducting its own charges, by cable into rubles in Russia; that plaintiff had paid in sufficient to obtain these 1000 rubles after paying charges; that this sum of 1000 rubles was to be forwarded, or remitted, which amounts to the same thing, to Tese Kaczier at the given address by the usual course of the Russian mail. This was the extent of appellant's primary duty under the contract. If the rubles were undelivered and were returned by the post-office and reaccepted by defendant, it is obvious that certain secondary duties might arise, either to return the rubles to plaintiff, or hold them subject to his order, or possibly, under certain circumstances, to make a fresh effort to forward them. It did appear that defendant allowed several months to elapse before notice to plaintiff of non-delivery. This he undertook to explain, and asked a commission to take testimony in Russia on that point. The commission was refused on the broad ground that the company had made an absolute agreement to deliver the money, and that ruling was sustained by the Supreme Court even under the written contract. This was erroneous, in view of our holding that. delivery was not insured."

The appellate court in the case just quoted also specifically held that the trial court erred in refusing to charge as requested by defendant, as follows:

"If the defendant's Russian correspondent, upon the receipt in due course of the cable message advising him to make the remittance to Tese Kaczier, purchased a money order for said 1000 rubles at the Russian post-office, enclosed the same in an envelope with postage prepaid, addressed to Tese Kaczier at the address given, this constituted a remittance of the money in the manner contemplated by the contract, whether or not Tese Kaczier ever received the money order." (Page 743.)

Plaintiff's action was there dismissed.

In Sommer *v.* Taylor, 190 N. Y. Supp. 153, the court held that under a contract by an express company to transfer by cable to a person in Roumania, the express company did all that was required of it by cabling the amount to a correspondent in Roumania, who notified the payee that the money was there to her credit, though the payee did not in fact receive the notice.

Hayduk *v.* Rotenbergs is not yet reported, but was decided by the Supreme Court of Ontario. The facts there were exactly as in the case at bar, and the opinion considers the subject in all its aspects so carefully that a full copy of this opinion is here given. The plaintiff's action was there dismissed. The opinion is as follows:

"IN THE SUPREME COURT OF ONTARIO.

"Copy of reasons for judgment of Middleton, J., delivered 18th March, 1922.

"Hayduk *v.* Rotenbergs, Limited.
"J. E. Jones, K. C., and Jenner, for the plaintiffs.
"McMaster, K. D., for the defendants.
"(Toronto Non-Jury, 2nd March, 1922.)

"Action brought by five Russians against the defendants to recover various sums paid to the defendants, a banking firm, for the purpose of purchasing roubles to be deposited to the credit of the individual plaintiffs in Russia.

3 D. & C.

"The transactions are evidenced by receipts given by the defendants, each of which has printed across its face in red ink and plain type the words 'subject to delay.'

"The first receipt in point of date is that of the plaintiff Negrafontor, and it reads:

" 'No. 2174.                    Toronto, Canada, September 24, 1917.

"Received from M. Negrafontor, at Toronto, three hundred and ninety dollars for (foreign currency) two thousand rs. (bank book to be remitted to Russia).                                        Rotenbergs Limited,

                                                    per A. A. R.'

"At this time this was the market value of roubles.

"The next receipt is in precisely the same form and is in favor of the plaintiff Hayduk for $605.00 to purchase 3300 roubles to be remitted to Russian Savings Bank, Moscow, and is dated October 22, 1917.

"The third receipt is dated November 26, 1917, in favor of the plaintiff Yastzaina for $360.30 to purchase 2400 roubles to be remitted to Russia Post Office, Taydydova, Province of Keiff.

"The fourth receipt is also in favor of Yastzaina, bearing the same day, for $15.40 to purchase 100 roubles to remit to Russia.

"The first of these two receipts was intended to go to the credit of the remitter himself; the second was for his wife.

"The next receipt, in favor of the plaintiff Kulick, is dated December 22, 1917, for $15.60 for 100 roubles, to be remitted to the wife of the sender in Russia.

"The last is a receipt of January 7th, 1918, for $58.85 to purchase 400 roubles, to be remitted for the plaintiff Palmea to Russia.

"In most of the cases the intention was that the moneys were to be placed in the Government Savings Bank in Moscow, or some other place in Russia. To enable this to be done, a form of application supplied by the Russian Government, containing sufficient information to satisfy them as to the identity of the remitter, was filled in and sent forward.

"The *modis operandi* was that when Rotenbergs had accumulated a few of these orders, they remitted them, with the accompanying papers, to enable the Savings Bank account to be opened, to their correspondent in New York. Business was done in New York through two different concerns, the American Foreign Banking Corporation and the Chase National Bank. Both of these concerns are financial institutions of unquestionable standing. They carried large deposits in various foreign centres, and on received orders wrote to the concerns in which they carried the credit balance to charge them with the amount of the orders, and to dispose of the sums as desired in the instructions received from Rotenbergs and their other correspondents.

"Owing to the unsettled condition of affairs in Russia following the revolution, no one knows what has happened. The evidence taken on commission in New York discloses that everything there was done in accordance with the usual course in business, but no advice has been received from Russia, and it is quite unknown whether the money has been placed to the credit of the remitters in the Government bank at Russia or not. For all that any one knows here, the transaction in each case has been carried out to the letter. It may also be said that no one knows whether the remittance has been interrupted or the credit account which it was to be charged to has been expropriated or destroyed by the revolution.

"Each of the plaintiffs swore to a bargain made at the time of the deposit that if the savings bank books, which would, in due course, have been sent out

to Rotenbergs through their New York correspondents, should not be forth-coming in various periods of running from three to six months, Rotenbergs undertook to return the money deposited in dollars.

"I entirely discredit these stories. It is most improbable that any such bargain would be made, and the evidence of the witnesses did not in any way commend itself to me. I think the real bargain was that indicated by the written receipt, the purchase of your money roubles at the market rate, and an undertaking by Rotenbergs to remit these roubles in the course of business to Russia.

"The price of roubles has so fallen that they may be said to be to-day with-out value, and Rotenbergs, as appeared in the course of the trial, without admitting any liability, were willing to refund in roubles. This was not acceptable to the plaintiffs—in fact, means nothing. It would be repayment of dollars by an equivalent number of cents.

"Even if the plaintiffs were entitled to recover at all, I think that this would be the measure of the liability to Rotenbergs.

"I am, however, of opinion that there is no liability on the part of the defendants. The bargain, as I understand it, would not call upon them to insure the remitter against the kind of thing that possibly has happened, if the funds have not actually reached their destination. All that they were called upon to do, in my view, was to transmit the business entrusted to them in the ordinary business way, and they were not to insure against loss by reason of revolution or war.

"Even if this should not be so, the plaintiffs would fail in this action for the lack of proof of the breach of any contract which ought to be found upon the evidence. I prefer to determine the case upon the greater ground, rather than to merely postpone the real litigation until the fate of the remittance to Russia can be ascertained.

"There was complaint that there has been such delay that it might have occasioned loss. This is not made the foundation of the actions, and it has not been shown that any delay that there was was a factor in their loss.

"The actions fail, and must be dismissed with costs."

Levich *v.* Merchants National Bank was decided in Minnesota, and is another case which has not yet been reported. There, too, the facts are exactly as in the case at bar, and the subject is very carefully considered from every angle and the opinion in full here given. A verdict for the defendant was there directed. St. Paul, Minn., November, 1922, Samuel Levich *v.* Merchants National Bank. The charge was as follows:

"Ladies and gentlemen of the jury, the evidence all being in in this case as adduced by both parties, the case has developed to a point where it is prac-tically a question of law on their evidence, the question being presented to the court by two motions respectively made by the plaintiff and the defendant. First, the defendant moves the court to direct the jury to bring in a verdict for the defendant. Counsel for the plaintiff moves for a directed verdict in favor of the plaintiff and against the defendant.

"There is a very interesting and novel situation involved, inasmuch as, owing to the methods of doing business, owing to conditions developed as a consequence and result of war conditions, there is little to guide the court in determining what the law is as applies to a situation of this kind. On the evidence as received and heard by you, the court is of the opinion that this particular transaction, so far as the legal end of the transaction itself is con-cerned, presents two phases. The plaintiff, it appears from the evidence, desired to have on deposit in a little town where he has lived, in the State of

3 D. & C.

Kiev, Southern Russia, the equivalent of $149.50, or, more concisely, 1000 rubles in Russian money, so that it would be available and in his own name for the purpose of check or order, or otherwise, for use in Russia. He accordingly went to the defendant bank to make the arrangements to have this 1000 rubles credit in the State of Kiev made. What he did then and there, according to the evidence, including two exhibits which have been offered in evidence, was to buy a credit for such use in Russia of 1000 rubles. The bank received at the then current rate of exchange the equivalent of 1000 rubles in American money, and also the sum of $1.75 for postage and expense of making the transfer of this credit, and gave plaintiff a receipt, which provides, among other things, for the payment of 1000 rubles upon account of pass-book in a government bank at the town named in the State of Kiev, the amount of that receipt being $149.50, which is the gross amount, including the $1.75 for expenses. When that was done, one phase of the transaction was completed; the plaintiff became the owner of 1000 rubles.

"The next phase of the transaction was the transmission of this 1000 rubles to the point designated by the purchaser, the plaintiff, in the State of Kiev. The legal relation between the plaintiff and the defendant then became a contractual one, wherein the defendant bank undertook to transfer to the designated government bank in Kiev, so selected by the plaintiff, the 1000 rubles to be placed to his credit in that bank in the designated town in Russia. It appears, and it is undisputed, that thereupon, on the same day, the local bank, who had sold the plaintiff 1000 rubles, deducting their share of the commission ordinarily charged in making exchange, remitted to a correspondent bank in New York City the money to be paid for a credit of 1000 rubles, to be entered in a pass-book for the plaintiff, in his name, in the designated town, with instructions for that correspondent bank to arrange for this credit in Russia. That correspondent bank accordingly transmitted the papers, addressed to its correspondent at Petrograd, for the purpose of having that bank or correspondent at Petrogad effect final credit in the Government bank in Kiev.

"The regular method of transferring money, using the common expression, from one country to another is not, as a general thing, the shipment of the identical money of a depositor or purchaser of foreign exchange; it is done by a system of credits, and that was attempted in this particular case. That is to say, the local bank here applies to a bank in New York that is in the habit of doing just that line of work of sending the depositor or purchaser the money, that the bank doing a foreign exchange business may make arrangements, not by shipment of the actual cash, but by successive credits to corresponding agents or representatives in the foreign country where, theoretically at least, the foreign exchange house in New York has or may have arranged for credits in its favor from which deductions for payments may be made.

"It became the duty of the defendant in this case to make the transfer, and what it undertook was to do so for the owner of the 1000 rubles, the plaintiff in this case. The bank's liability was such liability only as attends the act of an ordinary agent in doing the business for his principal. In other words, in making the transfer from St. Paul of the 1000 rubles, the defendant bank was the agent of the plaintiff in this case. It was the duty of the bank to use due care in the selection of the agencies through which the transmission of this money was to be made, and in the case of failure to make delivery, had its attention been called to the fact that the delivery had not in fact been made under the instructions given to the New York clearing house, to have called back the money, or to await further instructions from the plaintiff as

to what to do with it on account of failure to receive it at the other end of the line, or any other difficulty whereby the transfer could not be completed so as to give the credit to the plaintiff for the 1000 rubles. But in a case of this kind the bank is only held to exercise of due care in selection of its agencies, and is liable to a depositor or purchaser only for actual negligence of the agencies or misconduct on its part. If by reason of such negligence in the selection of its intermediary agents, or by reason of its misconduct, there is a breach of that contractual relation of principal and agent for the purpose of transferring 1000 rubles to its ultimate destination, the defendant is then liable for damage, and is not liable in an action for rescission. As construed in this case, the plaintiff has brought an action for rescission, seeking to recover the original sum paid for the 1000 rubles. Under the evidence in this case, the court is of the opinion that the only recovery that the plaintiff could get in the situation as developed, allowance being made for the rapid development of complete disorganization of government and commercial circles in Russia—the only damage he would be entitled to get, because of the fluctuation in the value of the rubles purchased, due to the war and war conditions, would be the value of the purchased exchange; that is to say, the value of the 1000 rubles at the time the demand for it was made or the action was brought. This is not an action for damage, and even though the complaint alleges that the bank negligently failed to make the transfer and issue the pass-book, it is in fact impossible, on the evidence in this case, if the complaint is construed an action for damages for breach of the contract, to recover a verdict in this case, because there is no evidence here as to what the value of the 1000 rubles is, from which the jury could render a verdict in American money.

"The court, therefore, denies the motion of the plaintiff for a directed verdict, grants the motion of the defendant and directs the jury to render a verdict in this case in favor of the defendant."

It is to be noted that in Katcher *v.* American Express Company, referred to above, the Russian rubles could not be delivered to the payee, and were in fact returned by the correspondent to the defendant. It was, therefore, held that defendant was liable to the plaintiff for the value of the Russian rubles so returned as of the time when they were returned to the defendant.

In every case where it has been held that defendant was liable to the plaintiff for the reason that the foreign money had in fact been returned to the defendant, the measure of damages has been held to be the value of the Russian rubles on the day when defendant received them back or of the day when a demand for their return was made upon defendant by plaintiff: Sommer *v.* Taylor, 190 N. Y. Supp. 153; Herzog *v.* Trust Co., 172 N. Y. Supp. 394; Fliker *v.* State Bank, 159 N. Y. Supp. 730; Foreign Trade Corp. *v.* Cosmopolitan Trust Co., 134 N. E. Repr. 403 (Sup. Ct., Mass.); Beecher *v.* Trust Co., 131 N. E. Repr. 338; Cosmopolitan Trust Co. *v.* Ciarla, 131 N. E. Repr. 337 (Sup. Ct., Mass.).

The court in Fliker *v.* State Bank, in holding that the bank was liable only for the value of the Russian rubles as of that time, said:

"The general purpose of a bank is not to act as a merchant, but as an agent for a principal, and that such is the relationship here is evidenced by the agreement, which describes its object to be a 'remittance,' which, in the words of Bouvier, is 'money sent by one merchant to another, either in specie, bill of exchange, draft or otherwise.' Plaintiff, the principal, purchased of defendant, the banking agent, 500 rubles, and, as part of the transaction, defendant was to endeavor to make delivery of plaintiff's 500 rubles to the

3 D. & C.

designated person. As the agent was unable to perform, his remaining obligation was to return the principal's property, the 500 rubles, to him. This has been tendered, and, to my mind, that ends the bank's obligation.

"To hold with plaintiff would be to also determine that at the place of payment, regardless of the market value of rubles, the payment by the bank, or its Russian correspondent, would have to be upon the basis of the purchasing value of rubles for $217 in United States money at that time and place. Clearly this was not the contract, and if the bank could not be called upon to be affected by a gain or loss in the value of rubles, if delivered in Russia, how can it be upon their return to New York? And, if so, at what point did this condition commence? Plaintiff dealt in rubles, and he is entitled to his rubles or their equivalent at the time of his demand." (Pages 731-32.)

It is an undoubted hardship that the plaintiff and his wife should not have had the benefit of this sum of money, but it is a hardship, like a host of others rising out of the chaos of the world's war, that fell heavily upon multitudes of others.

In consequence of this view of the law which requires the court to find in favor of the defendants, the question of the value of the ruble at the time of the demand for repayment, namely, April, 1922, becomes of no moment.

The court, therefore, finds for the defendants.